# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
January 5, 2011 Session

## STATE OF TENNESSEE v. MONTREL GILLIAM

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-00648     Lee V. Coffee, Judge**

---

**No. W2009-01664-CCA-R3-CD  - Filed May 4, 2011**

---

The defendant, Montrel Gilliam, was convicted by a Shelby County jury of first degree premeditated murder and three counts of attempted first degree murder.  He was sentenced by the trial court to consecutive terms of life imprisonment for the first degree murder conviction and as a Range I standard offender to twenty-five years, twenty-two years, and twenty years, respectively, for the attempted murder convictions, for an effective term of life plus sixty-seven years in the Department of Correction.  On appeal, he challenges the sufficiency of the evidence in support of his convictions and argues that the trial court erred by instructing the jury on his silence as a tacit admission to the crimes.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

James E. Thomas (on appeal and at trial) and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Montrel Gilliam.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; William L. Gibbons, District Attorney General; and Reginald Henderson and Pamela Fleming, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

    According to the State's proof at trial, on June 22, 2006, the defendant fired gunshots at Marsha Patten and her boyfriend, Alexander Collier, as the couple was driving through the

Ridgecrest Apartment Complex in the Raleigh area of Memphis. At the time of the shooting, eleven-year-old Martez Henderson and his four-year-old nephew, Donttreius Taylor,[1] were playing on the apartment complex's playground, which was located beyond the targeted victims within the line of the defendant's fire. Both children were struck by bullets, and Henderson died as a result of his injuries. The defendant was subsequently indicted by the Shelby County Grand Jury for the first degree premeditated murder of Henderson and the attempted first degree murders of Patten, Collier, and Taylor.

**State's Proof**

The State's first witness at trial was Brenda Henderson, the deceased victim's mother, who identified a photograph of her son and testified that he was eleven years old at the time of his death.

LaDonna Taylor, Donttreius Taylor's mother, identified a photograph of her son and testified that he was four years old at the time he was shot.

Andrea Whitmore testified that her sister dropped her, her son, her younger brother, Martez Henderson, and her nephew, Donttreius Taylor, at her apartment in the Ridgecrest Apartment Complex at approximately 10:30 p.m. on June 22, 2006. She took the children around the side to avoid walking through a dice game that was taking place in front, and Donttreius and Martez ran to the apartment complex's playground as she was unlocking her front door. After she had entered her apartment, she heard three gunshots, ran back to the front door, and encountered Donttreius, who was holding his arm and told her that he had been shot. She then ran to the playground, where she found her brother lying motionless on the ground. Whitmore testified that she learned later that evening that her brother had died. She identified various photographs of the Ridgecrest Apartment Complex, including one of Woodcliff Road, which led into the complex and from which she agreed there was a "straight shot" to the playground.

Latasha Mims testified that she was born and reared in the Douglas Community but in May and June of 2006 was living in the Ridgecrest Apartments. She had moved out of her apartment before the shooting, however, because "people from Ridgecrest and Douglas was into it," and she feared that she and her child might be in danger if they stayed. Mims explained that a man who lived in the Ridgecrest Apartments had been shot by a man from the Douglas Community, which upset the residents of Ridgecrest and resulted in a sign being

---

[1] We note that this victim's first name is spelled as "Donterius" in the trial transcript. We have, however, chosen to use the spelling contained in the indictment, in accordance with our standard practices.

spray-painted on the wall of the apartment building that read, "Douglas not allowed." The episode that precipitated her move occurred about two weeks prior to the shooting at issue in this case, when a group of people from the apartment complex surrounded the vehicle in which she and her child were riding, shot the driver, and put a gun to the head of her infant child.

On June 22, 2006, Mims returned to the Ridgecrest Apartments, where she still had her apartment, to visit her friend, Marsha Patten, who lived in another apartment in the complex. As she was returning to Patten's apartment after retrieving some baby bottles from her own apartment, she was accosted by a man who threatened her, saying, "Bitch, you going to get got tonight." Although she did not know the man's name at the time, she later identified him as the defendant from a photographic spreadsheet she was shown by the police.

Mims testified that later that same day, Patten left the apartment with her boyfriend, Alexander Collier. Two to three minutes after their departure, Mims heard gunshots and saw "a whole bunch of folks standing right outside the window," so she turned off the lights and the television and retreated to a back room of Patten's apartment. A few minutes later, Patten called her and conveyed a warning.

On cross-examination, Mims acknowledged that the first time she informed the police that it was the defendant who had threatened her was on July 19, 2006, when she identified him from the photographic lineup. On redirect examination, she said she had mentioned the threat to the police during her June 23, 2006 statement, but she did not know the identity of the person who had threatened her at that time.

Alexander Collier testified that he and Patten left Patten's apartment for the store at approximately 10:00 p.m. on the night of the shooting, passing through a crowd of approximately thirty-five to fifty people in order to reach their vehicle. As they were driving down Woodcliff, he heard a gunshot, the glass of his driver's door shattered, and a bullet passed through his driver's door and struck him in the inner thigh.

Marsha Patten testified that Mims moved out of her apartment about two weeks prior to the June 22, 2006 shooting because she had been involved in an earlier fight at the apartment complex and individuals, after the fight, "would continue to kick in her door and shoot up her apartment." Mims, however, returned to the apartment complex on June 22, 2006, to visit Patten in her apartment. Although Patten warned her to stay inside, at one point during the visit Mims went to her own apartment. When she returned, she informed Patten that she had just been threatened by someone who said, "Bitch, you going to get got tonight."

Later that evening, Patten and Collier left for the store, leaving Mims and her child behind in Patten's apartment. As they left, Patten noticed "a whole lot of people standing on [her] street," which worried her because she had not seen similar numbers of people gathered since the earlier fight. She and Collier, nonetheless, got into his vehicle and he began driving down Woodcliff. When they reached the bottom of the hill, a gunshot sounded and a bullet came through the driver's door and shattered the glass.

Memphis Police Officer Joy Jefferson identified various photographs of the scene, including one that had been taken from Woodcliff Road looking south toward the playground area of the complex.

Sergeant Frederick Adams of the Memphis Police Department's Felony Response Bureau also identified various photographs of the scene, including ones that showed a blood-stained area of grass near the playground and three spent .40 caliber shell casings that were found on Woodcliff Road on the night of the shooting. He said an apartment building was in between the playground and the area where those three shell casings were recovered.

Lieutenant Donald Crowe of the Memphis Police Department's Crime Scene Investigation Unit identified photographs that showed the bullet hole in the door of Collier's vehicle, the shattered glass on the floorboard, a bullet fragment recovered from the floorboard, and a bruise on Collier's right thigh where Collier reported that the bullet had struck his leg. On cross-examination, Lieutenant Crowe acknowledged that on the night of the shooting he had a man named Jamario Williams transported to the felony response office because he believed he was a possible shooter. On redirect examination, he testified that after Williams was removed from the scene, members of the assembled crowd gave him information that led him to believe the defendant was also a possible shooter in the case. As a result, he sought the defendant in one of the apartments in the complex but was unable to locate him.

Mikeisha Holmes testified that on the evening of June 22, 2006, she and several individuals, including the defendant, were sitting and talking in the hallway or balcony outside her grandmother's apartment. When asked what was going on, she replied that "the girls over there had got into it some more girls. That's how the buzz got involved in it and they brother or somebody had came over there and I guess they was waiting on a car to come through." As they waited, a man whom Holmes did not know knocked on the door of a nearby apartment. The defendant asked him if he had a gun, and he replied that he did. No one answered the door to the neighbor's apartment, and the man left soon thereafter. Approximately fifteen minutes later, the defendant left as well, going down the steps and returning a short while later with a black gun, which he laid across his lap as he sat back down in a chair.

-4-

After another fifteen minutes, the defendant got up quickly and, gun in hand, went "zooming" down the stairs. Holmes testified that she ran to the balcony and leaned over but was unable to see anything, so she followed the defendant downstairs and watched from behind a wall as he raised his gun and fired four gunshots at a car that was traveling down the street. She then ran back upstairs to the hallway balcony. The defendant arrived right behind her, still armed with the gun, and sat back down in his chair. A few moments later, a man named "Thomas," or "Flop," came down the hallway, pulled the defendant to the side, and said, "You know you just shot a baby and you just killed another boy." According to Holmes, the defendant looked confused as he replied "I didn't shoot no kids."

Holmes testified that she approached the police the next day, related what she had witnessed, and showed them where the defendant had been standing during the shooting, which enabled the officers to locate his spent shells. She said she told the officers that she had seen the defendant shooting the gun but did not tell them that she had left the balcony in order to do so because she was frightened, did not want to be labeled as a "snitch," and "really didn't know it was going to go this far."

On cross-examination, Holmes acknowledged that she had been convicted in three separate cases of theft of property. She further acknowledged that, in addition to not mentioning anything about having left the balcony, she had also drawn a diagram for the police to show where she had been standing at the time of the shooting, which she had labeled with the words, "Me and LaPaula, over the stairs, looking." She testified that Paula Taylor accompanied her down the stairs in order to witness the shooting but had asked her "not to put her name in it because she didn't want nothing to do with it." Finally, she acknowledged that she had dated the defendant prior to the shooting, before she learned that he had a girlfriend who lived in the apartment complex. She denied, however, that the knowledge had hurt her feelings, testifying that she had a boyfriend at the time as well.

On redirect examination, Holmes explained that her having "dated" the defendant consisted merely of having had sexual intercourse with him on one occasion. She said that they were never boyfriend and girlfriend, that they remained friendly after the intercourse, and that there was never any "breaking up" involved in their relationship.

Darrell Reed testified that at approximately 10:00 p.m. on June 22, 2006, he was with "Thomas Jones," or "Flop," and a couple of other men in the area of Leafy Hollow and Woodcliff when he heard gunshots. A few minutes later, he went up to the balcony of one of the apartment buildings, where the defendant, Jones, Holmes, and a couple of other individuals were assembled. While there, he overheard Jones tell the defendant that he had just shot a baby and the defendant, who dropped his head down, reply, "I didn't shoot no baby." Reed later acknowledged, however, that while the defendant dropped and shook his

-5-

head, he never actually said that he did not shoot any children.

Thomas Jones testified that he and Reed were outside when they heard gunshots and then saw the defendant running to one of the apartment buildings. When he reached the building, he saw the defendant, who was sweating and holding a black automatic pistol, sitting in the hallway with Holmes and a number of other people. Because a passing motorist had informed him as he was en route to the building that a baby had just been shot, and the defendant was the only individual he had seen in the area from which the gunshots had originated, he said to the defendant, "You just shot a baby." The defendant appeared shocked, did not reply, and disappeared as police cars began arriving at the complex.

Sergeant Kevin Lundy of the Memphis Police Department's Homicide Bureau testified that officers found some shell casings along the curb of the main road on the night of the shooting. The next day, officers re-canvassing the area found some additional shell casings in another area, visible from the playground, that Mikeisha Holmes pointed out as the spot where the shooter had been standing.

Sergeant Connie Justice of the Memphis Police Department's Homicide Bureau agreed that the playground was visible from the area to which Holmes had directed the officers and said that the shell casings recovered on the night of the shooting were damaged and appeared older.

Officer Roger Wheeler of the Memphis Police Department's Crime Scene Investigation Unit identified the shell casings located at the area on Shady Vista pointed out by Holmes on the morning of June 23, 2006, as three nine-millimeter casings and three .40 caliber casings.

Tennessee Bureau of Investigation Special Agent Forensic Scientist Cervinia Braswell, an expert in firearms identification, testified that the three nine-millimeter shell casings recovered from the Shady Vista location were fired from one weapon, and the three .40 caliber shell casings were fired from a different weapon. She said that the three .40 caliber shell casings recovered on the night of the shooting from the area on Leafy Hollow, which had damage "consistent with foot traffic or vehicle traffic," had been fired from a different weapon than the one that fired the .40 caliber shell casings found on Shady Vista.

Dr. Thomas Deering, the forensic pathologist who performed an autopsy of Martez Henderson's body, testified that the victim died of a gunshot wound to the chest in which the bullet passed through his right lung and caused a hole in his heart.

**Defendant's Proof**

Rachel Geiser, a private investigator employed by defense counsel, identified various photographs she had taken of the shooting scene, including ones that showed the respective positions in which Mikeisha Holmes, Thomas Jones, and the defendant were purportedly standing at the time of the shooting. She said she had measured the distances between those positions and found that Holmes was ninety-five feet and eleven inches, while Jones was two hundred eight feet and eleven inches, from the spot where the defendant purportedly fired the gunshots.

Kelley Howard, a former private investigator, identified a videotape she had taken of the Ridgecrest Apartment Complex at approximately 10:30 p.m. on June 22, 2008, which was admitted as an exhibit and published to the jury. On cross-examination, she acknowledged that photographs of the crime scene taken on the night of the shooting showed security lights on each building in the complex, which appeared to make the area well-lit.

Paula Taylor testified that LaDonna Taylor was her sister and Donttreius Taylor was her nephew. She said that at the time of the shooting, she lived in the apartment next door to Mikeisha Holmes's grandmother with another sister, Sharita Parker. On the day of the shooting, she, Holmes, the defendant, and a fourth individual, either "Woody" or "Darrell," had been sitting and talking on the breezeway outside Holmes's grandmother's apartment for "a little minute," which she defined as three or four hours, when a car pulled up and the fourth individual said to the defendant, "There go the car bro." The defendant immediately left, and she then heard shots fired. Next, the defendant returned to the balcony, appearing sweaty as if he had been running, and sat back down. A few minutes later, "Flop" arrived, pulled the defendant aside, and said something to him. At that point, the defendant left again. Taylor testified that she did not hear the defendant ask anyone for a gun and never saw him with a gun. She also said that Holmes remained seated in her same chair during the entire time that the defendant was gone from the balcony.

The defendant's final witness was Richard Ernest, an expert in the area of forensic ballistics, who testified that the "road rash" damage to the three cartridge casings found on June 22, 2006 could have occurred within a short period of time before the casings were discovered and was not necessarily a reflection of their age.

## ANALYSIS

### I. Jury Instruction on Tacit Admission

As his first issue, the defendant contends that the trial court committed reversible error

by instructing the jury that his silence in the face of accusations could be interpreted as a tacit admission to the crimes. The trial court issued the following jury instruction at trial:

> Tacit admissions: Members of the Jury, you have heard testimony that the defendant remained silent when a statement was made in his presence at a time when he was not under arrest or in custody. When a statement is made in the presence and hearing of one accused of an offense and the statement tends to incriminate him, or is of an incriminating character, and such statement is not denied or in any way objected to by him, both the statement and the fact of his failure to deny or make any response to the statement is admissible against the defendant as evidence of his acquiescence in its truth. On the other hand, his silence might be more or less equivocal and of little probative value. If you find that the defendant actually heard and understood the accusatory statements, and that they were made under circumstances that the defendant might be expected to have denied them if they were not true, then the jury should consider whether the defendant's silence was an admission of the truth of the statements, and give the silence whatever weight the jury believes it is entitled.

The defendant argues that the above instruction was given in error because the evidence showed that he did not, in fact, remain silent in the face of the accusations but instead denied them, either verbally, non-verbally, or both. The State argues that because the trial court properly determined that the defendant never denied firing any shots, the instruction was proper. In the alternative, the State argues that any error in issuing the instruction was harmless given the strength of the State's case against the defendant.

The trial court based the instruction on a similarly worded instruction that was issued by the trial court in State v. Black, 815 S.W.2d 166 (Tenn. 1991), which stated:

> Members of the jury, you have heard testimony that the Defendant remained silent when a statement was made in his presence at a time when he was not under arrest or in custody. Such evidence should be received with caution. Statements directed against the accused and in his presence may, in the absence of any denial or explanation, be entitled to weight as evidence. On the other hand, his silence might be more or less equivocal, and of little probative value. If the jury finds that the Defendant actually heard and understood the accusatory statements, and that they were made under circumstances that the Defendant might be expected to have denied them if they were not true, then the jury should consider whether the Defendant's silence was an admission of the truth of the statements, and give the silence

whatever weight the jury believes it is entitled.

Id. at 176 (internal quotation marks omitted). The issue in that case centered around the admission of the evidence itself rather than the trial court's cautionary instruction to the jury regarding its use. In its resolution of the issue, our supreme court, relying on Ledune v. State, 589 S.W.2d 936, 939 (Tenn. Crim. App. 1979), in which our court recognized Tennessee's long-standing rule allowing for the admission into evidence of tacit admissions, concluded that the defendant's response of "Huh," after being told by the victim's sister that he should kill himself if he were planning to commit a murder-suicide, was properly admitted by the trial court as an adoptive admission because the defendant was the target of the accusation, the defendant knew the reference that was being made, the accusation was of an incriminating nature, and the defendant neither denied nor objected to the accusation. Id. at 177.

In arguing that the trial court should not have given the jury instruction on tacit admissions, the defendant points out that, according to at least two witnesses, he denied the accusation that he shot a child. The trial court, however, determined that the instruction was warranted because the defendant failed to deny having fired any gunshots, rather than having merely denied that he had shot any children. We agree with the State that the trial court's instruction was not improper. We further agree with the State that the instruction, given the evidence, could not have affected the outcome of the case. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## II. Sufficiency of the Evidence

The defendant also challenges the sufficiency of the evidence in support of his convictions. Specifically, he argues that given the "inconsistent and non-credible testimony of Mikiesha Holmes," and the absence of any other eyewitness testimony to the shooting, "there is absolutely no evidence" that he fired or even possessed a weapon on the night of the shooting. The State argues that the evidence was sufficient for the jury to convict him of the crimes. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

When viewed in the light most favorable to the State, the evidence at trial was sufficient to establish the defendant as the perpetrator of the crimes. The State presented evidence to show that on the day of the shooting, the defendant threatened to "get" Mims, a former resident of the complex toward whom he harbored some sort of grudge or resentment; retrieved a gun as he waited on the balcony of an apartment for a car to come through the complex; ran down the stairs when the car was sighted; and fired multiple gunshots at the car's occupants, who were friends or associates of Mims. The State presented further evidence to show that the defendant's gunshots struck not only one of the individuals at whom he was aiming, but also two children who were playing on the playground in the defendant's line of fire, wounding one child and killing the other. The jury, as the trier of fact, was entitled to resolve any inconsistencies in Holmes's accounts of the shooting in favor of the State and to reject the testimony of the defense witness who claimed that Holmes was never in a position to witness the shooting. We note that Holmes's eyewitness testimony identifying the defendant as the man who fired gunshots at Collier's vehicle was bolstered by the testimony of Thomas Jones, who related how he first saw the defendant running from the area in which he had just heard gunshots and then found him, appearing sweaty and armed with a pistol, on the balcony of the apartment building where

Holmes and others were assembled. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE